IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| METROPOLITAN ST. LOUIS EQUAL HOUSING & OPPORTUNITY COUNCIL, | ) ) ) |
| Plaintiff, | ) Case No.: 4:13-cv-00481-HEA ) |
| vs. | ) ) |
| NORMAN L. JEZEWAK, and SIGNATURE PROPERTY, L.L.C., | ) **JURY TRIAL DEMANDED** ) ) |
| Defendants. | ) |

### RESPONSE TO MOTION FOR SUMMARY JUDGMENT

Defendants' Motion for Summary Judgment alleges that Plaintiff, the Metropolitan St. Louis Equal Housing & Opportunity Council ("EHOC"), lacks standing to bring an action for violation of the Fair Housing Act, 42 U.S.C. §§ 3601 et al., ("FHA") based on Defendants' discriminatory conduct against EHOC's testers during civil rights tests conducted at property owned and/or managed by Defendants. This argument directly contravenes the Supreme Court's holding in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), which establishes that fair housing organizations, like EHOC, have standing to address civil rights violations uncovered by testers. By diverting time and resources from its other activities to testing the Defendants' property, EHOC has expended costs that are directly attributable to Defendants and independent of this lawsuit. Accordingly, EHOC has established standing to bring this action against Defendants.

### Facts and Procedure

EHOC brought action against the Defendants in this case alleging that they violated the FHA by taking the following discriminatory actions because of race, color, and or familial status:

1

refusing to rent a dwelling; discriminating in the terms, conditions, or privileges of rental of a dwelling; falsely representing that rental dwellings were not available; making discriminatory statements with respect to rental of a dwelling; and otherwise making rental dwellings unavailable. (Pl. First Am. Compl. at ¶ 19.)

EHOC's mission is "to ensure equal access to all housing for all people through education, counseling, investigation, and enforcement." (Defs. Statement of Uncontroverted Material Facts ("Defs. SUMF") at ¶ 1.) One of the tools that EHOC uses is matched pair testing, which is a technique to uncover hidden discrimination by evaluating how housing providers treat two similarly situated testers, one of whom is a member of a protected class and the other of whom is not. (Defs. SUMF at ¶¶ 3-4.) EHOC's complaint against Defendants is based on three matched pair tests conducted in 2011. (Defs. SUMF at ¶ 15.)

EHOC conducted a matched pair test for family status discrimination at Defendants' property on June 6-8, 2011 using two African American females. (Defs. SUMF at ¶ 17.) Based on the results of those tests, EHOC determined that there was evidence of familial status discrimination. (Defs. SUMF at ¶ 23.)  Additionally, because the Defendants gave inconsistent, and potentially pretextual, information to EHOC's testers and ultimately refused to negotiate with an African American tester (Defs. Ex.[1] 9, Tester's Telephone Narrative of Tiaa Harris), EHOC determined that there was circumstantial evidence of racial discrimination that required further investigation. (Defs. Ex. 12, Pl.'s Answers to Defs.' First Interrogs. at ¶ 5.)

Based on the results of the June test, EHOC conducted two additional, matched-pair tests of the Defendants' property. (Defs. SUMF at ¶ 25, ¶ 35.) One set of follow-up tests, in July 2011, was designed to test for racial discrimination (Defs. SUMF at ¶ 25.), and a second set in

---

[1] All references to "Defs. Ex." refer to the exhibits attached by Defendants to the Statement of Uncontroverted Material Facts submitted with their present Motion for Summary Judgment.

September 2011 was designed to test familial status discrimination. (Defs. SUMF at ¶ 35). In analyzing all three tests, EHOC determined that there was evidence of discrimination based on familial status, as well as race and/or color. (Defs. SUMF at ¶ 25; Defs. Ex. 8, Combs Decl. at ¶¶ 10-12; Defs. Ex. 12, Pl.'s Answers to Defs.' First Interrogs. at ¶ 5.)

All three matched pair tests were designed and coordinated by Katina Combs, EHOC's Testing Coordinator. (Defs. SUMF at ¶ 14.) Ms. Combs spent a total of 70 hours conducting all three sets of matched pair tests, and has continued to devote time on this case. (Defs. Ex. 10, Time Sheet for Testing of Defs.) Ms. Combs is compensated for 2080 hours of work annually. (Defs. SUMF at ¶ 13.) Ms. Combs kept contemporaneous record of her time investigating the Defendants' property, including identifying the date of the task, the nature of the task, and the time worked on each task. (Defs. Ex. 10, Time Sheet for Testing of Defs.) EHOC has determined the hourly rate for Ms. Combs's time by taking the sum of her salary and benefits, as well as a proportional share of the overall overhead expense, and divided that sum by 2080. (Pl. Ex. 4, Katina Combs Salary (2011).)

**I.      Summary Judgment Standard**

Summary judgment is only appropriate where "there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the responsibility of informing the court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir.2011) (en banc). The nonmovant must come forward with some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Credibility determinations, the weighing of the evidence, and the drawing of

3

legitimate inferences from the facts are jury functions, not those of a judge. *Id*. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 251-52.

**II.    Fair housing organizations can establish standing through testing in claims brought under the Fair Housing Act.**

The language of the FHA "show[s] a congressional intention to define standing as broadly as is permitted by Article III of the Constitution." *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209 (1972) (internal citation omitted). As a result, courts "lack authority to create prudential barriers to standing" in claims brought under the FHA. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982). "[T]he sole requirement for a fair housing organization to have standing to sue in its own right under the FHA is the Article III standard of an injury-in-fact." *Arkansas ACORN Fair Housing, Inc. v. Greystone Dev. Co.*, 160 F.3d 433, 434 (8th Cir. 1998) (citing Havens, 455 U.S. at 372). Plaintiffs sufficiently state an injury-in-fact by alleging "distinct and palpable injuries that are 'fairly traceable' to [defendant's] actions." *Id.* (citing *Havens* at 376 and *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C.Cir.1990)).

The Supreme Court has made clear that where a defendant's discriminatory actions have "perceptibly impaired [a fair housing organization's] ability to provide housing counseling and referral services – with a consequent drain on the organization's resources – there can be no question that the organization has suffered the requisite injury-in-fact." *Havens* at 379. Instead of looking at precisely what resources were diverted because of a specific act of discrimination, courts look broadly at the "deflection of the agency's time and money from counseling to legal efforts directed against discrimination." *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990). This deflection represents the "opportunity costs of discrimination, since although the counseling is not impaired directly there would be more of it were it not for the

4

defendant's discrimination." *Id*. While the court in *Dwivedi* finds that tester standing "is, as an original matter, dubious" and goes so far as to say that "the idea that [testers'] legal rights have been invaded seems an arch-formalism," it ultimately concludes that *Havens* compels the court to affirm standing for both testers and the fair housing organizations that employ them. *Id*. at 1526. It bases its finding on the rationale that "Congress can create new substantive rights . . . and if that right is invaded the holder of the right can sue without running afoul of Article III, even if he incurs no other injury." *Id*. at 1526-27.

"Nothing in *Havens* suggests that a fair housing organization lacks standing to recover for damages proximately caused by unlawful conduct toward its testers." *Cent. Alabama Fair Hous. Ctr., Inc. v. Lowder Realty*, 236 F.3d 629, 642 (11th Cir. 2001). Where an organization alleges diversion of resources through discrimination against its testers, "the organization is clearly not seeking or inflicting its own injury; the injury is inflicted by the defendants." *Id*. "There is an obvious difference between the situation . . . where an organization manufacturers [sic] the injury necessary to maintain a suit by expending resources on that very suit . . . and the situation where an organization incurs diversion of resources and frustration of purpose damages as a result of specific documented incidents of unlawful discrimination toward its testers." *Id*.

Since *Havens*, the Circuit Courts have consistently held that fair housing organizations can establish standing through testing. *E.g. Cabrera v. Jakabovitz,* 24 F.3d 372 (2d Cir. 1994) (allowing a fair housing organization to recover damages based on the defendants' unlawful discrimination toward its testers where organization, acting on its own initiative rather than in response to a specific complaint, sent testers to investigate racial steering claims); *Alexander v. Riga*, 208 F.3d 419, 427 n.4 (3d Cir. 2000) (upholding standing where organization "diverted resources to investigate" via testing); *Hooker v. Weathers,* 990 F.2d 913, 915 (6th Cir. 1993)

5

(finding standing where organization "devoted resources to investigating the defendants' practices and alleges that it has confirmed that defendants do discriminate on the basis of familial status"); *Dwivedi*, 895 F.2d at 1526 (7th Cir. 1990) (holding that "the only injury which need be shown to confer standing on a fair-housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination" even where "counseling is not impaired directly"); *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (upholding standing where organization diverted resources to investigate defendants through testing); *Cent. Alabama*, 236 F.3d at 642 (11th Cir. 2000) (rejecting argument that allowing standing based on discrimination towards testers permitted fair housing organization to "create its own injury").

"Where a fair housing agency conducts tests or other investigatory measures to identify unlawful housing discrimination, the agency suffers a redressable injury in court because its resources have been diverted and its mission to eliminate housing discrimination has been frustrated." *S. Cal. Hous. Rights Ctr. v. Krug,* 564 F.Supp.2d 1138, 1149 (C.D.Cal. 2007).

### III. EHOC has established standing by articulating frustration of purpose and diversion of resources that are fairly traceable to Defendants and not self-inflicted.

The Supreme Court has held that a "concrete and demonstrable injury to the organization's activities" is established where a plaintiff can show that it had "been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services . . . [and] had to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory steering practices." *See Havens* at 379 (notation in original). Since *Havens*, courts have split over whether an organization must prove both frustration of purpose and diversion of resources to demonstrate injury-in-fact or whether a showing either frustration or diversion is sufficient. *Compare Smith v. Pacific Prop. and Dev. Corp.*, 383 F.3d 1097, 1105 (9th Cir. 2004) ("[A]n organization may satisfy the Article

6

III requirement of injury-in-fact if it can demonstrate: (1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular housing discrimination in question.") *with Equal Rights Center v. Equity Residential*, 483 F.Supp. 2d 482, 486 (D. Md. 2007) ("To allege a redressable injury-in-fact caused by defendants under the FHA, plaintiff need only allege facts that demonstrate that the defendants' actions either have caused the organization to divert resources to identify and counteract the defendants' unlawful practices, or that the challenged actions have frustrated plaintiff's mission.").

Under either standard, Defendants' motion must fail because EHOC has produced sufficient evidence to demonstrate both frustration of purpose and diversion of resources. As EHOC's damages stem from an investigation and follow-up investigations specifically targeting Defendants and were not self-inflicted, its injuries are fairly traceable to Defendants.

### a.  **Defendants' discriminatory actions have frustrated EHOC's purpose.**

In support of their motion for summary judgment, Defendants' assert that "frustration of purpose is nothing more than an abstract social goal, and not a concrete injury-in-fact required to confer standing to the EHOC in this matter." (Defs.' Mem. In Supp. of their Joint Mot. For Summ. J. at 6.) This is a blatant misstatement of the law. In *Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 76 (3d Cir. 1998), the Third Circuit reviewed a nearly identical statement by a district court: "frustration of mission . . . cannot constitute, as a matter of law, an 'injury in fact.'" The Third Circuit rejected this assertion outright, stating, "This is not an accurate statement of the law. *Havens* made clear that where discriminatory practices have perceptibly impaired an organization's ability to carry out its

7

mission, there can be no question that the organization has suffered injury in fact." (internal citations and quotations omitted).[2]

Where a plaintiff, like EHOC is "organized with the principal purpose of helping to eliminate discrimination against individuals . . . by ensuring compliance with laws intended to provide access to housing . . . [a]ny violation of the FHA[] would therefore constitute a frustration of [its] mission." *Smith v. Pacific Prop. and Dev. Corp.*, 358 F.3d at 1105 (internal citations omitted). "That the alleged injury results from the organization's noneconomic interest in encouraging open housing does not affect the nature of the injury suffered." *Havens* at 380 n. 20. In *Heights Community Congress v. Hilltop Realty, Inc.*, 774 F.2d 135, 137 (6th Cir. 1985), the plaintiff was awarded a declaratory judgment but received only $1 in nominal damages and no injunctive relief. Despite the limited nature of the relief, the judgment was upheld in the face of a challenge to the organization's standing because the evidence supported a finding that the defendants' steering practices had impaired the organizations ability to carry out its policy of maintaining an open and integrated community. *Id.* at 139 n.2.

In this case, Defendants' discriminatory actions have frustrated EHOC's mission and forced it to divert resources from other purposed to investigate and combat Defendants' discriminatory actions. As a result of diverting personnel resources to investigate Defendants, EHOC employee Katina Combs was unable to initiate sales and lending testing that she had planned on beginning in September 2011 and was unable to devote her time to assist a potential client who had contacted EHOC on August 25, 2011 seeking assistance on a foreclosure issue.

---

[2] While the court in *Montgomery Newspapers* ultimately found that the facts of that case were insufficient to "substantiate any perceptible impairment to the mission," that finding was premised on the failure to identify a connection between the organization's diversion of resources and the defendant's actions. *Id.* Unlike the present action, *Montgomery Newspapers* dealt with an organization claiming standing by means of an investigation of a broad base of housing providers rather than the focused testing of a specific housing provider. *Id.*

8

(Defs. Ex. 2, Pl.'s First Am. Compl., ¶ 2.) Accordingly, Defendants' discriminatory actions have frustrated EHOC's mission, both generally by decreasing the overall availability of equal and open housing and specifically, by preventing EHOC from working on other projects.

### b. EHOC has been forced to divert time and other resources investigate Defendants' discriminatory actions.

It is not necessary for a fair housing organization, like EHOC, to show that it that it has been forced to make certain "specific quantifiable expenditures" to demonstrate injury in fact. *Saunders v. General Services Corp.*. 659 F.Supp. 1042, 1052 (E.D. Va. 1987). The only requirement is that the organization can demonstrate "some perceptible impairment in its role of facilitating open housing." *Id.* Courts have found that "the mere fact that the plaintiff had devoted resources to investigating the alleged discrimination was sufficient" to establish standing, even where the plaintiff "did not indicate[] what [it] would have otherwise done with those resources." *Fair Housing Council, Inc. v. Village of Olde St. Andrews, Inc.*, 210 Fed. Appx. 469, 478 (6th Cir. 2006) (citing *Hooker v. Weathers,* 990 F.2d 913, 915 (6th Cir. 1993)). Organizations do not need to "prove that they cut other services due to [their] investigation," as "anytime an organization such as the Fair Housing Council funds a particular project . . . the pool of resources that it has to combat other instances of discrimination grows smaller." *Id.* "In our world of scarce resources, every expenditure of money, time, or other resources results in the loss of benefit that would have resulted if the same time or money had been spent on something else." *Id.*

Where a fair housing organization devotes staff time to investigating a defendant's discriminatory actions, damages can measured by determining a fair compensation for the agency's time spent in its investigation. In *United States v. Balistieri*, 981 F.2d 916, 924 (7th Cir. 1992), the Seventh Circuit examined claims by a fair housing organization that conducted a test

9

of a housing provider that "was not prompted by any complaints about discrimination but rather was intended to provide a new tester the opportunity to conduct a test." After the conclusion of that test, the fair housing organization determined that there may be evidence of discrimination and that additional testing was warranted. *Id.* The court upheld a damage award of $5,000 based on the value of the time spent "conducting tests . . . and following up on the results of those tests." *Id.* at 933. The court reasoned that where the organization's employee was able to "testif[y] about the staff time spent on that effort and the cost of that effort, and explain[] he figures to the jury . . . the jury could reasonably find that the [organization] had suffered damages." *Id.*

The evidence cited in Defendants' Statement of Undisputed Material Facts, in addition to other evidence that has been disclosed to Defendants through the discovery process, clearly establishes that EHOC invested non-trivial time and resources into *pre*-litigation investigation of the Defendants' property once EHOC learned of Defendants' discrimination. EHOC has provided time records for its Testing Coordinator clearly listing, by date of activity performed, each investigation task performed and the time spent on those activities. (Defs. Ex. 10, Katina Combs Time Sheet.) These pre-litigation activities included:

- Scouting the area for listings of available apartments;
- Creating tester profiles for testers assigned to investigate Defendants' property;
- Assigning and debriefing testers who investigated Defendants' property;
- Preparing testing summaries of tests of Defendants' property; and
- Analyzing testing results to determine whether there was evidence of discrimination.

*Id.* In addition, EHOC has provided an hourly rate for its employees, documented by reference to the agency's budget at the time the tests occurred. (Pl. Ex. 4, Katina Combs Salary (2011).)

10

Overall, EHOC's Testing Coordinator spent 70 hours in pre-litigation investigation of Defendants. (Defs. Ex. 10, Katina Combs Time Sheet.) Additionally, EHOC has also diverted its testers from other activities to test the Defendants' properties.

Moreover, EHOC's funding from the United States Department of Housing and Urban Development ("HUD") under the Fair Housing Initiatives Program ("FHIP") is irrelevant, under the collateral source rule, to establishing that it has diverted resources to investigate defendants. Where state law recognizes a collateral source doctrine, federal courts will as well. *See Overton v. United States*, 619 F.2d 1299, 1306 (8th Cir. 1980). The common law collateral source rule provides that a tort award should not be offset by compensation that a plaintiff receives from another source. *Id.* "The rule permits recovery against a wrongdoer for the full amount of damages even though the plaintiff is also compensated from a different source . . . which is 'wholly independent' of the wrongdoer and whose payment is therefore collateral to his." *Id.* (citing *Iseminger v. Holden*, 544 S.W.2d 550, 552 (Mo. 1976)). Additionally, the Missouri collateral source rule assumes that a "plaintiff deserves any additional compensation he may receive because he has contracted for it." *Id.* "One can justify a double recovery where the original source was supplied by the plaintiff, himself, out of resources that would otherwise have been available to him for other purposes." *Id.* (internal quotes and citations omitted).

The collateral source rule applies to claims under the FHA. *See Baltimore Neighborhoods, Inc. v. LOB, Inc.*, 92 F. Supp. 2d 456, 465 n. 9 (D. Md. 2000). "A damages action under the [FHA] sounds basically in tort." *Curtis v. Loether*, 415 U.S. 189, 195. Other courts have applied the collateral source rule in federal discrimination cases, including cases under the FHA. *E.g. Baltimore Neighborhoods,* 92 F.Supp. 2d at 465 (applying rule in FHA

11

case); *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1171 (6th Cir.1996) (applying rule in Title VII case).

EHOC's HUD funding is collateral and not double compensation because it was not awarded specifically to compensate EHOC for the costs it incurred investigating Defendants' discriminatory practices. While EHOC made a decision to use grant funding to support further investigation into Defendants' rental practices after their first test revealed evidence of discrimination, EHOC's grant obligation did not require EHOC to use the grant money for that particular purpose. Accordingly, as the funds could have been used for another purpose (e.g. to conduct additional audit testing on other housing providers), the collateral source rule applies and the receipt of grant money does not offset damages. *See Baltimore Neighborhoods* at 465 n. 9 (refusing to offset a FHIP award in an FHA case on the grounds that "while [a fair housing organization] used the grant [to address a defendant's discrimination], it could have been used for another purpose"); *see also Village of Olde St. Andrews, Inc.*, 210 Fed. Appx. at 478 ("[T]he mere fact that the Fair Housing Council had already allocated funds [from a HUD grant] for the use of testers does not mean that the use of a portion of those funds to investigate [defendant] does not amount to a concrete injury.").

c. **EHOC's damages are fairly traceable to Defendants' discriminatory actions.**

The Eighth Circuit has not addressed the issue of a fair housing organization's standing through testing, but it has looked at standing for fair housing organizations in other contexts. In *Arkansas ACORN,* 160 F.3d at 434, the Eighth Circuit examined a fair housing organization's claim for damages based on discriminatory advertising. The organization in that case contended that its "staff members spent a minimum of 15 hours per month monitoring advertising of housing providers—including advertising published by [defendants]—and identifying violators of fair housing laws." *Id*. The court recognized that "distinct and palpable injuries that are fairly

12

traceable to petitioner's actions . . . [satisfy] the Art. III requirement of injury in fact" and that "the deflection of an organization's monetary and human resources from counseling or educational programs to legal efforts aimed at combating discrimination, such as monitoring and investigation, is itself sufficient to constitute an actual injury." *Id.* Based on the facts of that case, though, the court determined that the organization was unable to show that its injury was "fairly traceable" to defendants. *Id.* Instead of identifying resources specifically used to monitor the defendant, the organization in that case asserted that it diverted resources "monitoring advertisements of a broad base of housing providers." *Id.* It provided "no facts to quantify the resources, if any, that were expended to counteract the effects of a single, allegedly discriminatory advertisement" and could not identify "what resources were used in identifying [defendant] in particular as an alleged violator of the FHA . . . [or] in determining the discriminatory effects specifically attributable to [defendant's] advertisements." *Id*. Accordingly, while the court accepted that the organization had diverted resources, it rejected standing because the organization was unable to show that those resources had been directed towards a specific defendant. *Id.*

In contrast, EHOC's diversion of resources in this case was directly attributable to the Defendants' discriminatory conduct. Unlike the organization in *Arkansas ACORN*, EHOC's damages are not based on monitoring or investigating a "broad base of housing providers." Instead, EHOC's diversion of resources was targeted specifically to investigate the Defendants. Unlike the plaintiff in *Arkansas ACORN,* 160 F.3d 434, who could not identify "what resources were used in identifying [defendant] in particular as an alleged violator of the FHA," all of EHOC's resources were used to identify specific violations of the FHA by Defendants during

tests of their properties. The discriminatory actions in this case were made directly by Defendants to EHOC's testers.

As the Eleventh Circuit recognized in *Central Alabama*, 236 F.3d at 642, "an organization incurs diversion of resources and frustration of purpose damages as a result of specific documented incidents of unlawful discrimination toward its testers." Because of Defendants' documented discriminatory actions toward EHOC's testers, EHOC's damages are fairly traceable to Defendants.

### d.  EHOC's damages are not self-inflicted.

Despite Defendants' assertion to the contrary, EHOC has not "manufactured" its injury in this case. In evaluating fair housing cases, the Circuits have split as to whether a fair housing organization "must demonstrate that it suffered a concrete injury that is completely independent from the economic and non-economic costs of litigation" or whether it can claim standing based solely on "showing that they devoted resources to litigation to counteract the defendant's housing discrimination." *Olde St. Andrews* 210 Fed. Appx. at 474. The Eighth Circuit falls in the latter group. *Arkansas ACORN* 160 F.3d at 434-35 ("[T]he deflection of an organization's monetary and legal programs to legal efforts aimed at combatting discrimination, such as monitoring and investigation, is itself sufficient to constitute an actual injury in fact."); *see also Olde St. Andrews* at 475 (identifying the Eighth Circuit, along with the Second, Sixth, and Seventh Circuits, as following the "more lenient approach" to standing). Defendants' claim that EHOC cannot establish standing for its subsequent race tests because the initial discriminatory motive was based on familial status is not only completely without legal justification, but also relies on the false assertion that the original test did not establish evidence of discrimination based on race and/or color.

14

Defendants' argue that their discrimination against EHOC's testers in the June 2011 test did not establish an injury-in-fact fairly traceable to Defendants because the test was a "self-imposed budgetary choice." (Defs.' Mem. In Supp. of their Joint Mot. For Summ. J. at 15.) Even if this Court accepts Defendants' argument, once EHOC documented specific incidents of unlawful discrimination towards its testers and diverted additional resources to conduct follow-up testing, those additional resources were directly traceable to Defendants' actions. Regardless of whether the original discrimination identified was based on race, familial status, or other protected class, EHOC's decision to conduct follow up testing would not have been made but for the Defendants' discriminatory actions, and is therefore fairly traceable to Defendants.

Furthermore, there is nothing implausible about the idea that Defendant Jezewak could have known (or at least made assumptions) about the race of EHOC's testers based on their phone calls alone. The vast majority of courts that have addressed the admissibility of racial voice identification evidence have concluded it is admissible. *E.g. Clifford v. Chandler*, 333 F. 3d 724, 731 (6th Cir. 2003) ("[W]e cannot conclude the mere identification of the race of an individual by the sound of his voice would be inherently unreliable."); *United States v. Card*, 86 F.Supp. 2d 1115, 1118 (D.Utah 2000) (testimony perpetrator of robberies sounded like African-American admissible); *State v. McDaniel*, 392 S.W.2d 310 (Mo., 1965) (upholding admissibility of an opinion as to whether an accent belonged to an African–American). Accordingly, given the Defendants' inconsistent, and potentially pretextual, use of the occupancy standards to justify a refusal to negotiate with an African American tester, EHOC's decision to conduct additional investigation into Defendants' potential racial discrimination and fairly traceable to Defendants' actions.

15

**Conclusion**

For the forgoing reasons, EHOC has demonstrated evidence that it has standing in this case and Defendants' Motion for Summary Judgment should be denied.

Dated: December 14, 2015				Respectfully submitted,

							METROPOLITAN ST. LOUIS EQUAL HOUSING & OPPORTUNITY COUNCIL

							/s/ Zachary M. Schmook
							Zachary M. Schmook, #5198318
							1027 S. Vandeventer Avenue, Sixth Floor.
							St. Louis, MO 63110
							Phone: (314) 246-9381
							Fax: (888) 636-4412
							Email: zschmook@ehoc-stl.org

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing document was sent via the Court's electronic notification system this 14th day of December 2015, to the following counsel of record:

Jeremy A. Gogel, #61866MO
The Gogel Law Firm
4542 West Pine Boulevard
Saint Louis, MO 63108
Phone: (314) 775-3864
Fax: (314) 531-1069
E-mail: jeremy@gogellawfirm.com

**Counsel for Defendants Norman L. Jezewak and Signature Property, LLC.**

								 /s/ Zachary M. Schmook
								Zachary M. Schmook

Case: 4:13-cv-00481-HEA   Doc. #:  51   Filed: 12/14/15   Page: 17 of 17 PageID #: 456